IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-cr-189-SI-2 |
| v. | **OPINION AND ORDER** |
| **TRAVIS TURNER**, | |
| Defendant. | |

Natalie K. Wight, United States Attorney, Ryan W. Bounds, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Sarah M. Hall, EPSTEIN, BECKER & GREEN PC, 1227 25th Street, N.W., Washington, D.C. 20037; and Kristen L. Winemiller, PACIFIC NORTHWEST LAW LLP, 333 SW Taylor Street, Suite 300, Portland, OR 97204. Of Attorneys for Defendant Travis Turner.

**Michael H. Simon, District Judge.**

Defendant Travis Turner has moved under 28 U.S.C. § 2255 to vacate, set aside, or

correct his judgment and sentence based on ineffective assistance of counsel. On June 20, 2023,

Pure Addiction Diesel Performance, LLC (Pure Addiction) pleaded guilty to the felony crime of

tampering with a monitoring device, in violation of the Clean Air Act (CAA), 42 U.S.C.

§ 7413(c)(2)(C). Turner is the sole owner and manager of Pure Addiction. On that same day,

Turner pleaded guilty to the misdemeanor offense of accessory after the fact to tampering with a

monitoring device, in violation of 18 U.S.C. § 3. Pure Addiction and Turner requested, without

objection by the government, that the Court waive the preparation of presentence reports and

proceed immediately to sentencing under their plea agreements made pursuant to

Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. After a thorough plea colloquy, the

Court accepted the guilty pleas from both Defendants, agreed to waive presentence reports, and

sentenced both Defendants as provided in their plea agreements. The Court sentenced Turner to

six months' incarceration, consistent with his plea agreement.

Turner now argues that one of his factual admissions, made both in his signed plea

agreement and confirmed orally during his plea colloquy under oath, is inaccurate. The

government does not dispute Turner's point but argues that, among other things, there is more

than enough record evidence to show that Turner is guilty not only of the misdemeanor offense

to which he pleaded guilty (accessory after the fact to tampering with a monitoring device) but

also of the felony offense of tampering with a monitoring device. The government also argues

that the misdemeanor offense to which Turner pleaded guilty, as well as the specific factual

description of Turner's culpable actions, were agreed upon during plea negotiations at the

request of Turner, through counsel, after the government had proposed that Turner plead guilty

to a felony offense with the government's recommendation of probation in exchange for an early

plea of guilty. During plea negotiations, Turner's counsel told the government that Turner would

rather plead guilty to a misdemeanor and receive a sentence of six months' incarceration than

plead guilty to a felony offense with probation. It appears that Turner has now changed his mind.

The Court has reviewed Turner's motion and exhibits (ECF 38, 41), the Government's response

and exhibit (ECF 47, 47-1), Turner's reply (ECF 48), and other relevant documents in the record.

The Court held oral argument on August 21, 2023. For the reasons explained below, the Court denies Turner's motion.

**STANDARDS**

**A.  aMotions Under § 2255**

Section 2255 of Title 28 of the United States Code permits a person in federal custody under sentence to move the court that imposed the sentence to vacate, set aside, or correct the sentence on the ground that:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . .

28 U.S.C. § 2255(a).

A person in federal custody seeking relief under § 2255 also must file this motion within a one-year statute of limitations. The limitations period begins to run on the latest of four dates:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

*Id*. § 2255(f). A judgment of conviction becomes final when the period for filing a direct appeal of that judgment lapses. *United States v. Gilbert*, 807 F.3d 1197, 1199 (9th Cir. 2015).

Under § 2255, "a district court must grant a hearing to determine the validity of a petition brought under that section '[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'" *United States v. Baylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (alteration and emphasis in original) (quoting § 2255(b)); *see also United States v. Rodriguez*, 49 F.4th 1205, 1213 (9th Cir. 2022) ("[A] hearing is mandatory whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims." (quoting *Baumann v. United States*, 692 F.2d 565, 571 (9th Cir. 1982))). In determining whether a § 2255 motion requires a hearing, "[t]he standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011) (quotation marks omitted) (alteration in original). A district court may summarily dismiss a § 2255 motion based on a facial review of the record "only if the allegations in the motion, when viewed against the record, do not give rise to a claim for relief or are 'palpably incredible or patently frivolous.'" *Id*. at 1063 (quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)). Conclusory statements in a § 2255 motion do not require a hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980).

If a court denies a § 2255 motion, similar to when a court denies a habeas petition, the court may issue a certificate of appealability if "jurists of reason could disagree with the district court's resolution of [the prisoner's] constitutional claims or [if] jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see* 28 U.S.C. § 2253(c)(2). Although the person in federal custody need not prove the merits of his case for the court to issue a certificate of appealability, the person must show "something more than the absence of frivolity or the existence of mere good faith on his or her part." *Miller-El*, 537 U.S. at 338 (quotation marks omitted).

### B.  Ineffective Assistance of Counsel

The leading federal case governing claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a challenger must prove: (1) that counsel's performance was deficient; and (2) that there is a reasonable probability that, but for the deficient performance, "the result of the proceeding would have been different." *Id.* at 688, 694.

Under the first *Strickland* prong, for counsel's performance to be constitutionally deficient, it must fall below an objective standard of reasonableness. *Id.* at 688. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687).

"*Strickland* held that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Smith v. Mahoney*, 611 F.3d 978, 986 (9th Cir. 2010) (quoting *Strickland*, 466 U.S. at 691).[1] As explained by the Supreme Court:

---

[1] *Strickland* and *Wiggins v. Smith*, 539 U.S. 510 (2003), both involved the assistance of counsel in the penalty phase of a capital case. The Supreme Court has clarified that a right to counsel exists during sentencing in a noncapital case. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *see also Davis v. Grigas*, 443 F.3d 1155, 1159 (9th Cir. 2006) (Graber, J., concurring) (explaining that *Strickland* applies "to a noncapital sentencing that is 'formal' and that involves findings or conclusions that provide a standard for the imposition of sentence").

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 690-91. The *Strickland* standard governing counsel's obligations "to investigate and to present mitigating evidence [applies] at sentencing." *Cox v. Del Papa*, 542 F.3d 669, 678 (9th Cir. 2008) (citing *Wiggins v. Smith*, 539 U.S. 510 (2003)).

Under the second *Strickland* prong, prejudice is established when there is "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. To show prejudice in the context of a plea of guilty, the challenger must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Smith*, 611 F.3d at 986 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). "The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill*, 474 U.S. at 56 (quotation marks omitted). In the sentencing phase of a noncapital case, trial counsel error that results in prejudice can satisfy the second prong of *Strickland*. *See Glover v.*

*United States*, 531 U.S. 198, 203 (2001) ("[A]ny amount of actual jail time has Sixth

Amendment significance.").

Because a convicted defendant must satisfy both prongs of the *Strickland* test, his failure

to establish either deficient performance or prejudice makes it unnecessary to examine the other

prong. *See Strickland*, 466 U.S. at 700. When the *Strickland* test is satisfied, the remedy under

§ 2255 is that the court "shall vacate and set the judgment aside" and do one of four things:

"discharge the prisoner or resentence him or grant a new trial or correct the sentence as may

appear appropriate." 28 U.S.C. § 2255(b).

## BACKGROUND[2]

As previously noted, Turner is the sole owner and manager of Pure Addiction.[3] In

April 2021, the Environmental Protection Agency (EPA) issued a Request for Information (RFI)

to Pure Addiction under the CAA.[4] Pure Addiction hired attorney Kyle Beall[5] to assist in

responding to the EPA.

Beall prepared for Pure Addiction's review and use a draft cover letter and draft

responses and objections to the EPA's RFI.[6] Beall also gave Pure Addition a template

---

[2] Exhibit citations refer to exhibits attached the Affidavit of Travis Turner (ECF 41-3), which are attached as ECF 41-4, unless otherwise stated. ECF 41-4 consists of 539 pages.

[3] ECF 41-3 at 1 (Turner Aff.).

[4] ECF 41-2 at 2-23 (Sinner Ex. A).

[5] According to his website, Kyle Beall is an experienced attorney based in Baton Rouge, Louisiana. For more than 25 years his practice has focused exclusively on advising clients on environmental regulatory issues. *See* Kyle B. Beall, Attorney at Law, *Meet Kyle*, https://beall.law/#about (last visited Aug. 22, 2023).

[6] ECF 41-4 at 25-29 (Ex. B).

spreadsheet for its use in responding to the RFI.[7] With its RFI, the EPA also provided a similar template spreadsheet for responding to its RFI.[8] Pure Addiction's staff prepared the information used to complete the spreadsheet, detailing Pure Addiction's specific sales and services.[9] Pure Addiction's staff added a column to the spreadsheet in which they described for specific line items purported exculpatory information, such as "emissions intact" and that the transactions *were only to sell parts and not install them*.[10] Pure Addiction, however, did not include copies of invoices or similar supporting documents with its response to the EPA.[11] In July 2021, Pure Addiction sent the EPA a cover letter, Pure Addiction's corporate formation information, and the *completed spreadsheet*.[12] Beall reviewed and approved Pure Addiction's response before it was sent[13] but Turner personally signed and certified the accuracy of the submission to the EPA.[14]

In November 2021, the U.S. Attorney's Office issued a subpoena to the custodian of records for Pure Addiction, requiring the production of documents and testimony before a federal

---

[7] ECF 41-1 at 2 (Sinner Aff.); 41-2 at 33-38 (Sinner Ex. C).

[8] ECF 41-2 at14-23 (Sinner Ex. A).

[9] ECF 41-3 at 2-3 (Turner Aff.); ECF 41-2 at 42-53 (Sinner Ex. D).

[10] ECF 41-3 at 2 (Turner Aff.); ECF 41-4 at 125-133 (Ex. C).

[11] Pure Addiction's invoices include the following statement: "Performance parts are strictly for off road and closed circuit racing, not for street use." *See* ECF 41-4 at 135 (Ex. D). The RFI requested copies of documents signed by Pure Addiction or its customers that contained "disclaimers" or "waivers," including statements that "the product is only for testing, maintenance, racing, offroad, or other restricted use." *See* ECF 41-2 at 11 (Sinner Ex. A).

[12] ECF 41-4 at 31-133 (Ex. C).

[13] ECF 41-1 at 4 (Sinner Aff.).

[14] ECF 41-4 at 32 (Ex. C).

grand jury.[15] The U.S. Attorney's Office agreed to a rolling production by Pure Addiction. In

December 2021, Turner and Pure Addiction hired a criminal defense attorney recommended by

Beall, Kevin Collins.[16]

      Almost immediately Beall, Collins, and Pure Addiction worked together to gather and

produce documents responsive to the government's subpoena.[17] Within about two weeks of

Collins being retained, Pure Addiction began producing documents, and it produced copies of

invoices and other responsive documents through March 24, 2022.[18]

      In July 2022, the EPA sent Beall a Notice of Intent to File an Administrative Complaint

for Violations of the Clean Air Act and Opportunity to Confer Prior to Filing.[19] In August 2022,

upon Collins' request, the U.S. Attorney's Office provided a "reverse proffer."[20] In its reverse

proffer, the government explained that the "defeat devices" that "tuned" vehicles and the

"delete" services to bypass vehicle on-board detection systems that were provided by Pure

---

[15] ECF 39-8 (Turner Aff. Correct Ex. F) The Court notes that after it granted Turner's motion to file documents under seal, there appears to have been an error by counsel and the document filed as Exhibit F to the Turner Affidavit was erroneously the Exhibit F of the Sinner Affidavit. It is not the document proposed to be filed as Exhibit F, the December 2021 Grand Jury subpoena, nor the document identified in Turner's Affidavit as Exhibit F, the Grand Jury subpoena. Thus, the Court accepts that the correct Exhibit F is the original exhibit as proposed in Turner's filing, ECF 39-8, the Grand Jury subpoena dated December 14, 2021.

[16] According to his website, Kevin Collins is an experienced attorney based in Austin, Texas. He is a partner with the law firm Bracewell LLP and has been practicing law for more than 18 years. He formerly practiced as an Assistant U.S. Attorney in the Eastern District of Texas, who transitioned to private practice. His practice focuses on defending persons during government investigations. *See* Bracewell, *Kevin D. Collins*, https://bracewell.com/people/kevin-d-collins#t0 (last visited Aug. 22, 2023).

[17] ECF 41-3 at 4 (Turner Aff.); ECF 41-1 at 5 (Sinner Aff.).

[18] *Id.*

[19] ECF 41-4 at 258-71 (Ex. H).

[20] *Id.* at 273 (Ex. I); 276-315 (Ex. J).

Addiction violated the CAA. The government also reviewed its evidence, including hundreds of invoices from Pure Addiction, the testimony of two former employees from Pure Addiction, and emails between Pure Addiction and its supplier of the defeat devices. According to these former employees, identified by the government as "Former Employee X" and "Former Employee Y," Pure Addiction had been performing "deleting" services on diesel trucks as a "common practice," that "everyone knew it was 'illegal,'" and that when Turner was asked what would happen if Pure Addiction "were to get caught," Turner said that "he would file bankruptcy and reopen a shop elsewhere under a new name."[21]

The government also described discrepancies between Turner's 2021 spreadsheet response to the EPA's RFI and the 2022 document production to the federal grand jury, which demonstrated the falsity of some of the representations to the EPA that Turner made on the submitted spreadsheets. These were based on the column added by Pure Addiction's staff with the purportedly exculpatory information. The government's reverse proffer described that although the 2021 spreadsheet identified that 87 customers were only provided parts, the invoices showed that 46 of those transactions involved "tune and delete" work, not merely the sale of parts. The presentation highlighted one example, showing the 2021 "parts only" spreadsheet line item juxtaposed against the applicable invoice showing tuning and labor.[22] The reverse proffer also highlighted an example of an item identified as "emissions intact" alongside the corresponding invoice showing tune and delete work that was performed, rendering false the "emissions intact" representation on the spreadsheet. The government further highlighted that Turner reported in the added spreadsheet column that his personal truck had "emissions intact,"

---

[21] ECF 41-4 at 305-06 (Ex. J).

[22] *Id.* at 299.

but in the 2022 document production the government received emails and invoices that belied that assertion by Turner.

The parties began plea negotiations to resolve Turner's potential criminal case, which soon became a global resolution that would include the EPA's proposed civil complaint.[23] The EPA insisted on an individual conviction of and personal criminal liability for Turner.[24] The EPA had begun pursuing criminal cases against individuals and corporations as a national priority and was concerned about setting a precedent.[25] The government was willing to forgo incarceration for a preindictment guilty plea to a felony.[26] Turner, however, was unwilling to plead guilty to a felony charge because he wanted to protect his constitutional rights, including his right to bear arms under the Second Amendment and his right to vote.[27]

As explained by Collins in his affidavit:

> 5.    The U.S. Environmental Protection Agency and the U.S. Attorney's Office were steadfast in their demand for felony dispositions for both Pure Addiction and Mr. Turner as an individual. EPA personnel explained to me that the agency's main concern was setting precedent for the multitude of emissions tampering cases that remained pending around the country.
>
> 6.    Mr. Turner was equally adamant that he did not want to agree to a felony to resolve his individual case because, among other reasons, he wanted to retain his Second Amendment rights and his right to vote.
>
> 7.    Because Mr. Turner did not want a felony, I asked Assistant U.S. Attorney Ryan Bounds if EPA would consider a

---

[23] *See id.* at 317-18 (Ex. K), 320-21 (Ex. L), 325 (Ex. N), 331-33 (Ex. O).

[24] *Id.* at 317-18 (Ex. K).

[25] *Id.*; *see also id.* at 471-73 (Ex. S).

[26] *Id.*

[27] *Id.* at 469 (Ex. R); ECF 47-1 at 3 (Gov. Ex. A, Collins Aff.).

misdemeanor with a stipulated period of incarceration. This first approach to Mr. Bounds was exploratory. I made clear it wasn't an offer. After Mr. Bounds confirmed with EPA that a misdemeanor plea might be agreed to, Mr. Turner authorized me to negotiate a misdemeanor as part of a global resolution that would resolve his personal criminal liability, his company's criminal liability, and EPA's civil demands. Once we started global resolution discussions, we asked for 30 days, and the government asked for 60 days. After the first global resolution meeting, EPA came back, apologized for any miscommunication, and stood on 6 months. We continued to attempt to negotiate on 45, 60, or 90 days, or some combination of 6 months that included a period of home confinement in lieu of total jail time. However, the government never agreed to a term of less than 6 months.

8.      The misdemeanor approach was a *parallel track* to the government's demand that Mr. Turner, in his individual capacity, plead to a felony violation of the Clean Air Act. The facts of the case supported the felony plea, but negotiation of a misdemeanor—even one with a stipulated sentence—achieved Mr. Turner's goals of maintaining his Second Amendment rights and right to vote.

9.      The misdemeanor approach was not based upon the government "*discovering*" a mistake in Pure Addiction's RFI response and then *adding* a misdemeanor charge to punish Mr. Turner as an individual. Quite the opposite—the misdemeanor approach was the product of negotiation with the EPA, which demanded that Mr. Turner, who served as the sole and managing member of an LLC that had violated the Clean Air Act, be held personally responsible for his actions.

10.      During the negotiation process, Mr. Turner was aware of the misdemeanor approach. We had multiple telephone calls discussing the strategy. He reviewed draft emails. We even discussed using the length of incarceration as a strategy to decrease the civil penalty demand during global settlement discussions. Mr. Turner was also aware that he could resolve his case with no period of incarceration, if he accepted the government's felony plea offer.

11.      Ultimately, Mr. Turner elected to accept the misdemeanor plea offer.

12.      Once Mr. Turner accepted the plea offer, he personally reviewed the government's draft charging instrument and plea agreements. He was frustrated with some of the language in those

documents, but I explained to him that he was getting the benefit of a misdemeanor and the "Accessory After the Fact" count provided the basis for the misdemeanor plea. At his request, we suggested changes to the language in the charging instrument and plea agreements, and the government accepted all our proposed changes.

\* \* \*

17.    At all times during the negotiation and through Mr. Turner's decision to plead guilty, Mr. Turner was aware, because I explained to him, that he had three options: (a) go to trial, (b) accept the government's felony plea offer, which would have likely resulted in a sentence of probation, or (c) accept the misdemeanor plea offer with a period of incarceration. Mr. Turner accepted the misdemeanor disposition, which allowed him to retain his rights under the Second Amendment, his right to vote, and avoid a felony in his personal background. The negotiation process also helped Mr. Turner avoid paying criminal fines both as an individual defendant and on behalf of his company—fines which could have been significant in this case under the Alternative Fines Act.

ECF 47-1 at 2-3, 5 (emphasis in original).

As Collins explained, without conferring with Turner, he proposed to the U.S. Attorney's Office the idea of Turner pleading guilty to a misdemeanor offense with six months' jail time, noting that Collins would still need to discuss that idea with Turner and obtain Turner's agreement.[28] After that, Collins attempted to negotiate with the government the possibility of Turner only serving between 30 and 90 days of incarceration, but the government held firm at requiring six months if Turner was to receive the benefit of pleading guilty only to a misdemeanor charge rather than to a felony.[29] Otherwise, the government offered, Turner could

---

[28] ECF 47-1 at 2 (Gov. Ex. A, Collins Aff.); ECF 41-3 at 6 (Turner Aff.); ECF 41-4 at 326 (Ex. N).

[29] ECF 41-4 at 484-86 (Ex. U); ECF 47-1 at 2 (Gov. Ex. A, Collins Aff.).

receive no incarceration if he pleaded guilty to a felony charge, similar to resolutions of other individuals who were prosecuted for similar crimes.[30]

Ultimately, Turner and the government agreed that Turner would plead guilty to a misdemeanor offense and jointly request six months' incarceration as a sentence.[31] On May 23, 2023, the government provided to Collins both a draft Information charging Turner with the misdemeanor offense of being an accessory after the fact to tampering with a monitoring device and a draft plea agreement to that charge.[32] The draft plea agreement originally recited that Turner engaged in the charged misdemeanor offense by engaging in the following conduct:

> Specifically, on July 21, 2021, in response to an information request sent by the U.S. Environmental Protection Agency pursuant to 42 U.S.C. § 7542(a), Turner provided inaccurate information about Pure Addiction's activity in tuning and deleting vehicles. In that response, Turner identified approximately 46 instances in which Pure Addiction sold only parts to the vehicle owners. In reality, Pure Addiction both tuned and deleted those vehicles at its repair shop.

ECF 41-4 at 500 (Ex. Y). The Information recited the same details. *Id.* at 512; *see also id.* at 513 (charging Turner with assisting Pure Addiction because Turner "provided a response to an information request sent by the EPA, claiming that in 46 instances, PURE ADDICTION sold only parts to their customers when, in reality, PURE ADDICTION removed the emissions controls from those vehicles at its diesel shop and modified the on-board diagnostic (OBD)

---

[30] ECF 41-4 at 484-86 (Ex. U).

[31] *Id.* at 495 (Ex. X).

[32] *Id.* at 498-513 (Ex. Y) (The Court notes that it appears that the date on this exhibit was automatically generated based on the date the draft plea agreement was last opened, and thus when Turner's current counsel created the Exhibit on July 27, 2023, in preparing the current motion and exhibit, the date of the draft plea agreement updated to July 27, 2023. The transmittal email attaching the document was dated May 23, 2023, and Turner's final plea agreement (ECF 18) is dated May 30, 2023. Thus, his draft plea agreement could not have been dated July 27, 2023.).

PAGE 14 – OPINION AND ORDER

system on the trucks to prevent the OBD from detecting the removal of such control equipment").

Collins promptly forwarded the drafts to Turner, asking for his review, particularly of the "factual allegations." On May 25, 2023, Turner responded that the factual allegation paragraph was "inaccurate" and should be "retracted" because "there has been complete cooperation and full transparency provided."[33] He believed that the paragraph implied "deception or nefarious behavior," which he contended did not occur during the investigation.[34] He stated: "Were customer invoices misread? Interpreted incorrectly? Perhaps other work was performed later on the vehicle? All invoices were accounted for and provided to best of Pure Addictions [*sic*] ability."[35]

In an email to Turner dated May 26, 2023, with the subject "Draft language: Suggestion," Collins proposed that they send to the government a revised paragraph describing Turner's conduct for the plea agreement and Information, reading:

> Travis Turner, as the owner of Pure Addiction, took actions to assist Pure Addiction in order to hinder or prevent its apprehension for the crime of Clean Air Act Tampering. Turner provided sales invoices that contained inaccurate or incomplete information about Pure Addiction's activity in tuning and deleting vehicles. Specifically, some invoices reflected "parts only" transactions when, in fact, some transactions included additional service work that violated the Clean Air Act tampering regulations. In reality, Pure Addiction both tuned and deleted those vehicles at its repair shop.

---

[33] ECF 41-4 at 518 (Ex. Z).

[34] *Id.*

[35] *Id.*

ECF 41-4 at 520 (Ex. AA). Collins noted that he did not know if the government would accept

the changes. He also reminded Turner: "We have to provide facts that support the 'Accessory

After the Fact' misdemeanor."[36]

　　　　After sending the proposed changes to Turner for his review, Collins sent the proposed

revisions to the government.[37] Collins also requested that the government stipulate to a plea

agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, rather than a plea

under Rule 11(c)(1)(B). Collins also proposed that the parties agree to a joint motion to waive

the presentence report and proceed promptly to sentencing.[38] The government agreed to Collins'

requests.[39]

　　　　The factual allegations in the plea agreement relating to Turner's conduct were changed

to reflect the wording in the paragraph proposed by Collins.[40] The government neglected to

change the Information. On May 31, 2023, Collins emailed Turner, stating that the government

"accepted all of our proposed changes in your individual plea agreement—*including the more*

*general language that we discussed*."[41] Collins also informed Turner that the government had not

changed the Information. Collins then emailed the U.S. Attorney's Office, pointing out that the

government had neglected to also change the Information.[42] The government apologized for the

---

[36] ECF 41-4 at 520 (Ex. AA).

[37] *Id.* at 522 (Ex. BB).

[38] *See id.*

[39] *Id.* at 528 (Ex. DD).

[40] *See* ECF 18 at 3 (Plea agreement).

[41] ECF 41-4 at 528 (Ex. DD) (emphasis added).

[42] *Id.* at 525 (Ex. CC).

oversight and agreed to change the Information.[43] The factual allegation relating to Turner in the Information was changed to the same paragraph as the plea agreement and the specific charge in the Information was changed to read that in response to the RFI, Turner "provided 46 invoices falsely indicating that PURE ADDICTION had sold only parts when, in fact, PURE ADDICTION had performed additional service work in violation of United States Code, Section 7413(c)(2)(C)."[44]

On June 12, 2023, Turner emailed his civil attorney Beall and stated: "I'm just really frustrated with the please [sic] agreement wording and the accessory after the fact charge and the media perception of me. It pisses me off because the statements are not true. Idk what to do at this point."[45]

On June 20, 2023, the Court conducted a hearing on Turner's change of plea. During this plea colloquy, the Court confirmed that Turner had sufficient time to review the charges against him and ask questions of his attorney, had his questions answered to his satisfaction, and was fully satisfied with his legal representation.[46] Turner also confirmed that he understood the charges against him.[47] The Court then addressed Turner's individual plea documents.[48] Turner confirmed that he signed and understood the petition to plead guilty and confirmed its factual

---

[43] *Id.*

[44] ECF 2 at 4-5 (Information).

[45] ECF 41-4 at 535 (Ex. FF).

[46] ECF 46 at 7-8 (Transcript).

[47] *Id.* at 8.

[48] *Id.* at 12-14.

accuracy.[49] Turner next confirmed that on May 31, 2023, he signed the plea agreement letter

dated May 30, 2023 (ECF 18), that he read it before he signed it, and that he understood it.[50] The

following colloquy then took place, with Turner answering under oath:

> THE COURT: Does [the plea agreement letter] correctly reflect
> your understanding of your plea agreement with the Government
> in this matter?
>
> DEFENDANT TURNER: Yes.
>
> THE COURT: And to the best of your knowledge and belief, *are
> the facts recited in that plea agreement letter true and correct*?
>
> DEFENDANT TURNER: *Yes.*

*Id.* at 14 (emphasis added).

The Court later had the government recite the elements of Turner's crime of accessory

after the fact. The government explained them to be: (1) Turner is a person; (2) knowing that an

offense against the United States—CAA tampering—had been committed; (3) he received,

relieved, comforted, or assisted the offender, Pure Addiction; (4) in order to hinder or prevent its

apprehension, a trial, or punishment.[51] The government noted that it would produce the same

evidence of guilt as previously described for Pure Addiction's guilt for CAA tampering, with the

addition that Turner took actions to hinder or prevent Pure Addiction's apprehension for that

crime.[52] The prosecutor also explained that Turner provided to the EPA:

> a response to its information request, certain sales invoices that
> included inaccurate or incomplete information about Pure
> Addiction's activity in tuning and deleting trucks. Specifically
> some of those invoices reflected parts-only sales transactions

---

[49] *Id.* at 12.

[50] *Id.* at 13-14.

[51] *Id.* at 27.

[52] *Id.* at 27-28.

> when, in fact, those vehicles included additional work that was
> done at Pure Addiction that violated the Clean Air Act tampering
> provisions.

*Id.* at 28.

The Court expressly asked Turner:

> Mr. Turner, do you agree that you, Mr. Travis Turner, knowing
> that an offense against the United States, specifically Clean Air
> Act tampering had been committed and that you received, relieved,
> comforted, and/or assist[ed] the offender in order to hinder or
> prevent the offender's apprehension, trial, or punishment?
>
> *Are those facts correct with respect to you personally, Mr. Turner*?

*Id.* at 31 (emphasis added). Turner, under oath, responded "Yes, Your Honor."[53]

Turner then pleaded guilty to the misdemeanor offense charged, and the Court found that

Turner was fully competent and capable of entering an informed plea, "aware of the nature of the

charges and the consequences of the plea; and that the plea of guilty is a knowing and voluntary

plea supported by an independent basis in fact containing each of the essential elements of the

offense."[54] The Court accepted the plea under Rule 11(c)(1)(C), accepted the parties' joint

waiver of a presentence report, and as jointly requested by the parties sentenced Turner to six

months in prison.[55]

On July 31, 2023, Turner filed the pending motion challenging his sentence. His motion

relies on the argument that Collins engaged in ineffective assistance of counsel. In his reply,

---

[53] *Id.*

[54] *Id.*

[55] ECF 23 (Judgment); *see generally* ECF 46 (Transcript).

Turner added an argument based on actual innocence of the crime as described in the Information. The Court extended Turner's self-surrender date to August 24, 2023.[56]

## DISCUSSION

Turner argues that Collins provided ineffective assistance because he did not consider the ineffectiveness of attorney Beall when Beall first represented Pure Addiction in responding to the EPA's RFI, and thus compounded Beall's purported errors. Specifically, Turner contends that Beall should have provided copies of actual invoices to the EPA because they contained disclaimers that the product was not for street use. Turner also argues that Collins provided constitutionally deficient services when he proposed a six month sentence for a misdemeanor offense when persons with felony convictions for similar conduct were not receiving any prison time and that Collins did not properly explain this situation to Turner. Turner also argues that he could not have engaged in the misdemeanor as charged, because it recites that Turner provided "invoices" to the EPA in response to the RFI when it is undisputed that Pure Addiction, under Turner's signature, did not provide invoices to the EPA in response to the RFI and only produced invoices in 2022 in response to the subpoena from the federal grand jury. Turner argues that Collins was ineffective for not properly explaining this fact. Turner additionally contends that Collins was ineffective because he did not more closely investigate the factual basis of the charges against Turner, particularly the purportedly false invoices recited in the Information. In his reply,[57] Turner adds that because of the erroneous fact in the Information relating to when he first provided copies of invoices, he was "actually innocent" and Collins offered ineffective

---

[56] ECF 42.

[57] Although the Court need not consider arguments raised for the first time in a reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), the Court addresses Turner's contention of actual innocence.

assistance because he failed to advise Turner that his "conduct does not support a conviction under the statute charged."[58] Turner also asserts that he suffered prejudice because he was "actually innocent."

## A. Deficient Performance

The record, including the documents submitted by Turner and his affidavit, belies Turner's assertions that Collins provided ineffective assistance. The record shows there was substantial evidence that Turner had engaged in felony misconduct. The record also plainly demonstrates that Turner was offered no prison time in exchange for pleading to a felony offense, but Turner rejected that offer. Indeed, during the negotiation of his global settlement of all criminal and civil charges, when arguing for a lower fine for the civil complaint, Turner asserted that his incarceration for his misdemeanor conviction would reduce the ability of Pure Addiction to earn revenue and thus reduce its ability to pay a fine. The EPA responded that because Turner had rejected a plea deal that would have resulted in no incarceration, it was Turner's voluntary action that was creating the situation that he was arguing supported a lower fine and thus the EPA would not agree to a lower fine on that basis. Turner continued to reject the government's offer that he plead guilty to a felony with a joint recommendation of probation.

In Turner, Collins had a client for whom the evidence supported a felony conviction but who did not want a felony conviction on his record or the consequences that a felony conviction would bring. The government had been prioritizing the prosecution of other similarly situated individuals who were being convicted of felonies, most without prison or jail time. Turner, however, did not want that outcome. Collins' decision to explore six months' incarceration for a misdemeanor conviction was a strategic choice that is entitled to deference. It was also informed

---

[58] ECF 48 at 13.

by Turner's actions and desire to not plead to a felony. Collins reasonably understood that the government would not accept little or no incarceration time for a misdemeanor conviction when that was the deal offered by the government for a felony conviction. Collins ultimately tried to negotiate less time for Turner, but the government would not accept less than six months for a misdemeanor conviction.

Thus, Turner received the benefit of a misdemeanor conviction (rather than a felony conviction) and, in turn, accepted the downside of serving some time in custody. Although in hindsight Turner's current lawyer may argue that Collins should originally have approached the government with an offer of less than six months or further investigated the guidelines range before making an offer, and thereby executed a poor negotiation strategy, that is not the standard for ineffective assistance of counsel. *See Aguilar v. Alexander*, 125 F.3d 815, 821 (9th Cir. 1997) (rejecting a habeas petition based on ineffective assistance of counsel that argued in part that counsel provided constitutionally unsound representation in plea negotiations as merely "differences in the strategy, tactics, and styles of defense attorneys"); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (stating that a "difference of opinion" with respect to tactics "does not constitute a denial of effective assistance of counsel"). As Collins stated in his email to the U.S. Attorney's Office first exploring whether a misdemeanor plea might be an option, he knew the EPA was "locked in and has its reasons" for pushing so hard on the individual felony conviction. Collins made a strategic choice to make an aggressive misdemeanor offer to move the agency from the felony conviction.

Turner's argument that Collins' representation was constitutionally unsound because Collins failed to consider that Beall did not send the invoices with the RFI response is similarly unpersuasive. Collins joined the defense team and almost immediately Pure Addiction began

producing the invoices to the government. Although Turner appears to argue that the invoices somehow would have provided *exculpatory* evidence if they would have been produced in 2021 because of the one sentence disclaimer, those invoices in fact constitute significant *inculpatory* evidence that was relied on by the EPA and the U.S. Attorney's Office. The presence of the disclaimer did not dissuade the EPA or the U.S. Attorney's Office from pursuing both criminal charges and civil enforcement based on the invoices. The invoices also were used to discover inconsistent information between Turner's representations in the spreadsheet and the data contained in the invoices, which was the basis of the government's accessory after the fact charge, as explained in the reverse proffer. Collins' strategic decision not to focus on the timing of the production of the invoices and whether they should have been produced sooner by a different attorney when they were produced promptly upon Collins joining the case and were the primary evidence against Turner and Pure Addiction are matters to which Collins' judgment is entitled to deference.

Turner also argues that Collins was ineffective for not explaining that Turner could not have committed the crime as precisely alleged because Turner did not provide any invoices to the EPA in response to its RFI, as the draft Information and plea agreement were revised to assert. The problem with this argument is that it was Collins who made this change *in response to Turner's concern* that the text of the original draft Information and plea agreement depicted Turner in a "nefarious" light. The original draft Information and plea offer, prepared by the U.S. Attorney's Office, described that Turner provided "inaccurate information" in response to the RFI by claiming in 46 instances that Pure Addiction sold only parts when in fact the government identified that Pure Addiction had performed tuning and deleting. This referred to the spreadsheet, which the EPA and U.S. Attorney's Office determined contained inaccurate

information in at least the 46 entries claiming "parts only" when tuning and deleting work had been done. The reverse proffer gave specific examples of the inaccuracies in the spreadsheet.

Turner objected, believing that he had fully cooperated during the EPA investigation and that this paragraph in the draft Information and plea offer made it seem like he had engaged in deception during the investigation. Thus, Collins rewrote the paragraph to try to portray Turner in a more positive light while still providing enough facts to support a plea of guilty to the misdemeanor charge of accessory after the fact. Collins changed the factual description, explaining that Turner had provided to the EPA in response to the RFI *invoices* that contained inaccurate information, instead of stating that *Turner* provided inaccurate information to the EPA (in the form of the spreadsheet created specifically to respond to the EPA). As Turner now argues, this attempt to separate Turner from directly supplying to the EPA the inaccurate information and instead portray him as supplying invoices does not appear to have been a factually correct and precise recitation of events. The original draft prepared by the U.S. Attorney's Office, however, was a factually correct recitation of events. Further, it was Turner who provided the inaccurate information in the additional column in the spreadsheet when he responded to the EPA. Nonetheless, the government accepted Collins' proposed changes.

Turner fails to show that Collins provided ineffective assistance by revising the paragraph to try to portray Turner in a more positive light. Although the revised paragraph is not completely factually correct because the inaccurate information in response to the RFI was in the spreadsheet inaccurately summarizing the invoices and not in invoices themselves (the invoices are what showed the spreadsheet to be inaccurate), Collins' revisions inured to Turner's *benefit*, even though they were not precisely correct. Instead of describing Turner as providing inaccurate information to the EPA in response to the RFI, the revisions portrayed Turner as providing

documents that contained inaccurate information, which offered somewhat greater distance between Turner and the inaccuracy. It was a strategic choice by Collins, attempting to balance the need to continue to support the misdemeanor charge and Turner's concern that the factually accurate paragraph drafted by the U.S. Attorney's Office portrayed Turner as engaging in "deception or nefarious behavior." Collins kept Turner well informed throughout the plea negotiation process and timely provided Turner with copies of all relevant documents, including the proposed draft of Collins' revisions. Turner and Collins specifically "discussed" that revised text, as their email correspondence confirms. Turner's post-judgment argument that his acceptance of this text was neither knowing nor informed rings hollow.

Turner also fails to show that Collins rendered ineffective assistance of counsel by failing to investigate the misdemeanor offense. The record supports that the government had ample evidence that Turner committed the felony offense of CAA tampering, the crime for which Pure Addiction was convicted. Turner argues that Collins should have investigated the "46 invoices." But as described above, the misdemeanor offense was negotiated during plea discussions as a resolution *requested by Turner* to avoid a felony conviction. It was a novel crime in this context. Further, *Collins* supplied the new text shifting the factual basis to *sales invoices* containing inaccurate information. The 46 inaccuracies were highlighted in the reverse proffer as 46 of the 87 "parts only" spreadsheet entries identified as incorrect when compared to the actual invoices. The original Information and plea agreement accurately stated that Turner provided inaccurate information to the EPA in response to the RFI. Collins requested changes to the factual recitation in the plea agreement and the Information, in response to the request of Turner, who was unhappy with the government's original text describing the facts underlying the misdemeanor. At that point, the global settlement had been negotiated. Under these

circumstances, it was not unreasonable for Collins not to investigate the specific purportedly inaccurate invoices that he proposed as the factual basis of the crime.

Finally, Turner has not demonstrated that Collins' performance was deficient because he failed to advise Turner that Turner was "actually innocent" of the crime as charged in the Information. For the same reasons discussed below in explaining why Turner fails to show prejudice based on actual innocence, he fails to show deficient performance. Turner does not show that his conduct does not support a conviction under the accessory after the fact statute or that no reasonable juror would convict him of that crime based on the evidence in the record. Thus, Collins did not render ineffective assistance of counsel for failing to advise him not to plead to the accessory after the fact misdemeanor.

## B. Prejudice

Turner fails to demonstrate the requisite prejudice under *Strickland*. He does not state anywhere in his affidavit that he would not have pleaded guilty to the misdemeanor charge.[59] Even if Turner were to make (or would have made) such an assertion, however, "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). Courts "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.*

The record is clear that Turner was quite cognizant of his option to plead guilty to a felony and serve no time in prison or jail. He rejected that option and even now makes no argument that he would have accepted it. He does not state that he is willing to go to trial or

---

[59] In the pending motion, Turner's current attorney argues in the reply brief that Turner would not have pleaded guilty but that is not contained anywhere in Turner's affidavit. Arguments in briefs unsupported by evidence are not evidence.

would have gone to trial had the correct facts been recited. To reiterate, Turner did not like the factual description originally drafted by the U.S. Attorney's Office and thus his attorney forwarded to Turner proposed revisions. Turner apparently approved these revisions because Collins sent it to the U.S. Attorney's Office after providing it in suggested form to Turner and Collins' later email to Turner confirms that the two had "discussed" the revised text. Moreover, Turner told the Court during the plea colloquy that the facts recited in the revised documents were true and correct. It is only now that Turner challenges the revisions as deficient.

As noted, during the plea colloquy, Turner did not give any indication to the Court that he had any concern or hesitation about the plea or the factual basis for the plea. Instead, he agreed under oath to the accuracy of his guilty plea and its factual basis. Turner's "statements at the plea colloquy carry a strong presumption of truth." *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012), *as amended* (May 31, 2012); *see also Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant [at a plea hearing] . . . as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."). The Court is "entitled to rely upon [Turner's] assurance that he understood the element of the crime to which he entered a guilty plea." *United States v. Peterson*, 995 F.3d 1061, 1067 (9th Cir.), *cert. denied*, 142 S. Ct. 472 (2021).

In his reply, Turner argues that he suffered prejudice because he is actually innocent of the crime as charged because he did not produce any invoices *in response to the RFI*. To succeed on this argument, Turner "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011) (quoting *Stephens v. Herrera*, 464 F.3d 895, 898 (9th

Cir. 2006)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."

*Bousley v. United States*, 523 U.S. 614, 623 (1998).

The government concedes that Turner is technically correct when he says that he did not

produce invoices *in response to the RFI*. Turner instead summarized the invoices on the

*spreadsheet* he provided to the EPA. The government concluded the spreadsheet contained

inaccurate purportedly exculpatory information after comparing Turner's summary of the content

of the invoices on the spreadsheet to the actual invoices. But given the evidence in the record, the

Court does not find that no reasonable juror would have convicted Turner of the *crime* of being

an accessory after the fact to CAA tampering. The U.S. Attorney simply could have amended the

Information to the original draft, and the evidence in the record is more than sufficient to support

a finding that a reasonable juror could have convicted Turner of that crime. The evidence does

not show that Turner is innocent of the crime. At most, it shows that Turner's attorney rewrote

the Information in a manner that inaccurately distanced Turner from the charge of directly

submitting to the EPA inaccurate information created in response to the RFI. The U.S. Attorney

agreed to make this revision during negotiations for Turner's plea deal. The U.S. Attorney,

however, could have easily corrected this and, absent the successful plea negotiations, would not

likely have reworded it in the first place to agree to a defendant's proposed changes. Thus,

Turner received the benefit of his proposed changes to the draft Information and plea agreement,

but that does not make him innocent of the *elements* of the charged offense.

As noted, actual innocence requires factual innocence and "not mere legal insufficiency."

*Bousley*, 523 U.S. at 623. The government is "permitted to present any admissible evidence of

petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy." *Id.*

at 624. "In cases where the Government has forgone more serious charges in the course of plea

bargaining, petitioner's showing of actual innocence must also extend to those charges." *Id.*; *cf.*
*Vosgien v. Persson*, 742 F.3d 1131, 1136 (9th Cir. 2014) (explaining that *Bousley* applies when
the government gives up more serious charges for a plea to lesser charges because "[o]therwise,
a petitioner could escape criminal liability because of a prosecutor's leniency in agreeing to
conviction on less serious, but now invalid, counts in obtaining the plea"); *Jaramillo v.*
*Stewart*, 340 F.3d 877, 883 (9th Cir. 2003) ("The [Supreme] Court has also stated that in cases
where the State has forgone more serious charges in the course of plea bargaining, the
petitioner's burden of demonstrating actual innocence must also extend to the more serious
charges."). "[A] petitioner's obligation to demonstrate actual innocence is limited to crimes
actually charged or consciously forgone by the Government in the course of plea bargaining."
*Santos v. Matevousian*, 2016 WL 1158238, at *2 (E.D. Cal. Mar. 24, 2016); *see also Torricellas*
*v. Davison*, 2006 WL 8446710, at *20 (S.D. Cal. Aug. 1, 2006) ("In cases where the government
has forgone more serious charges in the course of plea bargaining, Petitioner's showing of actual
innocence must also extend to any charges which were not pursued due to the plea bargain.").[60]

By submitting the government's reverse proffer, Turner provides evidence the
government had adduced of Turner's guilt of the accessory after the fact misdemeanor. The
reverse proffer provides specific invoices and other evidence that contradicts and demonstrates
the falsity of at least three exculpatory representations Turner made on the spreadsheet he

---

[60] Turner argued at the hearing that he need only show his innocence to the charge in the
Information, because otherwise the government could argue that he was going to be charged for
"terrorism" or any more serious crime. The record, however, must show that the government
actually gave up pursuing the more serious charge and there must be evidence in the record to
rebut a claim of actual innocence to the more serious charge. The government could not make up
any felony charge after the fact that it never intended to pursue because there would not be
evidence in the record that such a charge was consciously forgone by the government and may
not be evidence sufficient to show that a reasonable juror would convict the defendant of that
charge.

submitted to the EPA. This attempt to minimize Pure Addiction's culpability is evidence of Turner's guilt of accessory after the fact and he is unable to show actual innocence of the misdemeanor crime.

The record also shows that the government originally was pursuing more serious felony charges. This includes contemporaneous email communications, the reverse proffer, and the affidavit of Collins submitted in response to the pending motion. The evidence confirms the government's intention to charge Turner with felony charges and to allow him to plead guilty to a felony and avoid incarceration. Turner provides through the reverse proffer evidence the government adduced of Turner's guilt of the more serious felony charges it intended to pursue, CAA tampering (42 U.S.C. § 7413(c)(2)(C)) and conspiracy (18 U.S.C. § 371). The government consciously relinquished pursuing these felony charges during plea negotiations. Thus, Turner fails to show actual innocence because he cannot show that no reasonable juror would convict him of the more serious charges forgone by the government during plea negotiations.

Additionally, Turner unequivocally stated under oath during the plea colloquy both that his actions met the *elements* of the misdemeanor crime to which he was pleading guilty and that the facts as described in the plea agreement were accurate. Those were facts described in a modified manner that *Turner requested*. Turner offers no "compelling explanation" for why he stated under oath during his plea colloquy that the recitation of the factual basis for his plea was accurate but he now challenges that factual basis as inaccurate. *See Muth*, 676 F.3d at 822 (quoting *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005)). "Judges need not let litigants contradict themselves so readily; a motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." *Id.* (quoting *Peterson*, 414 F.3d at 827).

The Ninth Circuit has held that ordinarily, challenges that rest "on allegations that directly contradict the petitioner's statements" at the plea colloquy "must fail." *Id.* at 821. Because the record in this case shows that there is compelling evidence that the government can show beyond a reasonable doubt all the elements of the misdemeanor crime of conviction, particularly as it was described in the original Information, Turner's challenge "does not involve the most extraordinary circumstances" and thus fails. *Id.* at 822 (quoting *Lasiter v. Thomas*, 89 F.3d 699, 703 (10th Cir. 1996)). A "guilty plea is . . . a grave and solemn act," that should not be degraded "into something akin to a move in a game of chess." *United States v. Hyde*, 520 U.S. 670, 677 (1997) (quotation marks omitted). Turner may not now seek to avoid the consequences of his guilty plea because the government accepted his proposed revisions to the factual recitations to the advantage of Turner.

## C. Remedy

In his opening written motion, Turner requested that the Court "vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255" through "an order that his judgment and sentence be vacated, set aside, or otherwise corrected." ECF 38 at 1-2. In his conclusion, he added that the Court may "re-sentence him to a no-jail time sentence or other relief as the Court deems appropriate." *Id.* at 40. In his opening motion, however, Turner did not request that the Court dismiss, vacate, or set aside his guilty plea agreement or otherwise allow him to withdraw his plea of guilty. After asserting in his reply that he is actually innocent of the misdemeanor crime to which he was charged and pleaded guilty, Turner reiterated his originally requested relief and again did not ask Court to dismiss, vacate, or set aside his guilty plea.

At oral argument, the Court sought clarification of the precise remedy that Turner is seeking. Turner, through his new counsel, explained that Turner requests that his Judgment be vacated and that the Information be vacated or dismissed. Turner does not request that his plea

agreement be vacated, even though it contains the same challenged factual paragraph as found in the Information, which is not fully accurate. Indeed, Turner states that he desires to hold the government to certain provisions of the plea agreement, such as the agreement that the government not bring any other charges against Turner but vacate the judgment, sentence, and Information. Thus, Turner implies that he would be entitled to escape all personal criminal responsibility for his acts. Because the Court finds that Turner fails to show ineffective assistance of counsel, the Court declines to address his specific requested remedy.

**D.  No Need for Evidentiary Hearing**

The Court has reviewed the record, the briefing, and considered the arguments of counsel during a hearing. The "motion and the files and records of the case conclusively show that the [person in custody] is entitled to no relief" and thus an evidentiary hearing is not required. 28 U.S.C. § 2255. Further, Turner has not made specific factual allegations that require an evidentiary hearing to resolve. *See Withers*, 638 F.3d at 1062 (stating that an evidentiary hearing is required if "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted); *see also Carrillo v. United States*, 2023 WL 2663219, at *1 (W.D. Wash. Mar. 28, 2023) (declining to hold an evidentiary hearing because "[i]t is clear from the fact record that Mr. Carrillo was actively engaged in the plea negotiation process, that he was fully informed of his rights before choosing to plead guilty, and that he was provided diligent and competent representation").

**E.  Certificate of Appealability**

The Court declines to issue a certificate of appealability. Turner fails to overcome the strong presumption that Collins provided constitutionally sufficient representation. Turner also fails to show the even higher burden that he is actually innocent of the crime of being an

accessory after the fact. The Court does not find that a reasonable jurist could conclude

otherwise. *See Carrillo*, 2023 WL 2663219, at *2.

**CONCLUSION**

The Court DENIES Turner's Motion to Vacate Judgment and Sentence under 28 U.S.C.

§ 2255, ECF 38.

**IT IS SO ORDERED.**

DATED this 22nd day of August, 2023.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge
